**Mark and Monica BENNETT, Appellants,**

v.

**SECURITY INSURANCE COMPANY OF HARTFORD, Appellee.**

No. 05–03–01798–CV.

Court of Appeals of Texas, Dallas.

March 9, 2005.

Rehearing Overruled April 29, 2005.

Charles L. Hoedebeck, Charles L. Hoedebeck, P.C., Irving, Charles W. McGarry, Law Office of Charles McGarry, Dallas, for Appellants.

Randy A. Nelson, Wade Caven Crosnoe, Beth D. Bradley, Thompson, Coe, Cousins & Irons, L.L.P., Dallas, for Appellee.

Before Justices MORRIS, WHITTINGTON, and O'NEILL.

## OPINION

Opinion by Justice WHITTINGTON.

Mark and Monica Bennett appeal the jury's take-nothing verdict in favor of Security Insurance Company of Hartford (SIC). In two issues, the Bennetts contend the trial judge erred in submitting the wrong issues in the jury charge. We affirm the trial court's judgment.

### BACKGROUND

Mark worked for General Aluminum as a service technician. On March 4, 1996, he fell while on the job and was injured. The following day, Mark gave a statement to a claims adjuster for SIC. Mark had his first doctor's appointment on March 7, 1996. Following several weeks of physical therapy, medication, rest, a lower back MRI, a cervical MRI, and numerous doctor's examinations, Mark was told, on April 19, 1996, that he would need surgery to correct the large ruptured disc in his neck. That same day, SIC received a request to approve Mark's spinal surgery. SIC formally disputed coverage on May 2, 1996 and continued its investigation of the accident and Mark's injury. In a letter dated June 5, 1996, Mark was informed by the Texas Workers' Compensation Commission (TWCC) that the cost of surgery would be covered. Mark's surgery occurred on August 7, 1996.

Following surgery, the Bennetts sued SIC for violations of the Texas Insurance Code and the common-law duty of good faith and fair dealing by "creating and implementing corporate policies, environments, and schemes that required its employees to create artifices or pretexts to deny, delay or refuse reasonable and necessary medical treatment once the liability for the same became reasonably clear." Following a seven-day trial, the jury found in favor of SIC. This appeal followed.

### JURY CHARGE

In two issues on appeal, the Bennetts claim the trial judge erred in (i) failing to submit the instructions they requested and (ii) submitting incorrect instructions in the jury charge. The Bennetts claim their requested instructions reflected what they pleaded and proved and the trial judge incorrectly submitted a different theory of liability. They argue this jury charge error caused rendition of an improper judgment as evidenced by the take-nothing verdict. We disagree.

■ We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review. *In re V.L.K.,* 24 S.W.3d 338, 341 (Tex.2000) (citing *Louisiana–Pacific Corp. v. Knighten,* 976 S.W.2d 674, 676 (Tex. 1998)). The trial judge has "considerable discretion to determine necessary and proper jury instructions." *Tex. Workers' Comp. Ins. Fund v. Mandlbauer,* 34 S.W.3d 909, 911 (Tex.2000) (citing *Louisiana–Pacific Corp.,* 976 S.W.2d at 676); *In re V.L.K.,* 24 S.W.3d at 341. When a trial judge "refuses to submit a requested in-

struction, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Mandlbauer,* 34 S.W.3d at 912. An incorrect jury instruction is grounds for reversal only if it probably caused the rendition of an improper judgment. *Louisiana–Pacific Corp.,* 976 S.W.2d at 675. "To determine whether an improper jury charge constitutes reversible error, we consider the pleadings, the evidence, and the charge in its entirety." *Dallas County Sheriff's Dept. v. Gilley,* 114 S.W.3d 689, 691 (Tex.App.-Dallas 2003, no pet.).

Although the Bennetts claim the trial judge abused his discretion in submitting the wrong instructions to the jury and not giving their proposed instructions, we cannot agree. The Bennetts sued SIC for "violating the Texas Insurance Code and for breaching the common-law duty of good faith and fair dealing that was owed [Mark] in the processing of his claim for worker's compensation benefits" by "creating and implementing corporate policies, environments, and schemes that required its employees to create artifices or pretexts to deny, delay, or refuse reasonable and necessary medical treatment once the liability for same became reasonably clear." During voir dire, the jury pool was informed that Mark had received benefits and the case involved only bad faith in the investigation of the claim, specifically the delay in approving surgery.

The evidence showed Mark fell on March 4, 1996. SIC was informed of his injury on March 5, 1996, and that same day, one of the company's claims adjusters, Johnna Durham, began investigating the report by taking Mark's statement about the accident. At trial, Durham was questioned extensively about her background, how the claims process worked, why she questioned Mark's injury, her job performance reviews at SIC generally and, specifi-

cally, whether her decision to investigate Mark's injury was based on her March 19th job performance review. She also testified in detail about the delay in ordering copies of Mark's medical files and requesting a second opinion as well as SIC's decision to formally dispute coverage on May 2, 1996. Durham testified that, in a letter dated June 5, 1996 addressed to the Bennetts and copied to Dr. Capello, the TWCC stated the "second-opinion doctor" concurred with Dr. Capello's recommendation for surgery and that "the carrier is liable for the reasonable and necessary costs of spinal surgery related to the compensable injury."

Dr. Juan Capello, an orthopedic surgeon with a subspecialty in the spine, testified he first saw Mark on March 7, 1996 and concluded he had a pinched nerve in the neck and a muscle-ligament injury to the lumbar spine area. He prescribed medication, physical therapy, and rest. Dr. Capello saw Mark again on March 14 and he felt "quite strongly" Mark had a pinched nerve or a herniated disk. In early April, Mark had a lower back MRI and two appointments with Dr. Capello who told Mark to continue with physical therapy and ordered a cervical MRI.

Following his cervical MRI, Mark met with Dr. Capello on April 19, 1996, at which time the doctor recommended Mark have surgery. Dr. Capello faxed his recommendation to SIC who requested copies of Mark's medical records and ordered a second opinion. Dr. Capello testified it was his opinion that Mark's condition "would not get better with conservative management." He also opined that if Mark did not have surgery, he would continue to have pain, headaches, muscle spasms, sleeplessness at night, a heaving feeling in his legs, arm pain, and numbness in his fingers. Although Mark's surgery was scheduled for June 28, 1996, it was

postponed until August 7, 1996. Dr. Capello testified he did not cancel the June surgery.

Dr. Capello saw Mark on August 16, 1996 for a post-operative examination. In late August, he indicated Mark might be ready for light duty in two weeks. The following month, Dr. Capello released Mark to drive a car and mow his lawn. In November, General Aluminum had a light-duty job for Mark which involved answering phones, writing up service calls, and dealing with sales and customer supervisors by phone. Dr. Capello stated it would be "okay" for Mark to do light duty work provided he started out "at four hours a day sitting and standing intermittently, no climbing or lifting over 15 to 20 pounds, and no frequent bending." Mark told his therapist he could not go back to work because it was a "dangerous place to be." In a report dated January 1997, Dr. Capello stated Mark had reached his maximum medical improvement level.[1] Three months later, General Aluminum sent Dr. Capello a letter detailing job opportunities for Mark. Believing Mark could perform one of the jobs, he asked a staff member to contact Mark. Dr. Capello testified Mark did not want to go back to light-duty work at General Aluminum. In May, Mark's physical therapist reported to Dr. Capello

Patient cannot be compliant with physical therapy secondary to his school schedule. Patient should start biofeedback which is verified. Patient needs to go to gym/health club for workout and do maintenance at home. He needs to wean off modalities which he wants in physical therapy. He does not want to exercise when he does come to physical therapy.

In late July, in response to a letter from SIC, Dr. Capello stated he felt Mark could return to light duty. Mark complained and asked Dr. Capello for "work hardening" physical therapy[2] instead of being released to return to work. In August 1997, Mark asked Dr. Capello to look over Mark's nursing school application to El Centro College. In response to the question "Do you have any physical limitations which would affect your ability to lift, turn, or transfer patients?", Mark answered, "No." Mark also indicated he only took medication for hypertension.

In response to the question whether he had "an opinion as to whether or not [the] six-week delay [in Mark's surgery] caused any additional damage," Dr. Capello testified, during his deposition, "I can't recall right now any objective evidence." On November 21, 1997, Dr. Capello wrote "[n]o longer treating physician" on Mark's file.

By deposition, Dr. Brooks Trotter, Mark's internist, testified he had seen Mark fifteen times since April 1996. According to Dr. Trotter's records, Mark had not complained of any long-term neurological deficits. Furthermore, Dr. Trotter's examinations of Mark revealed "nothing in [Mark] to indicate irreversible injury as a result of any delay in surgery."

Dr. R. Craig Saunders, the orthopedic surgeon who performed the second opinion examination concurring in the need for surgery, also testified by deposition. Dr. Saunders saw Mark on February 7, 1997 for an independent medical evaluation. At that time, he saw "no evidence of any acute motor process going on" and did not see "any contraindication for the patient to continue driving, lifting, and other activi-

---

1. Due to circumstances outside the doctor's control, the report was not delivered until July 1997.

2. Work hardening is an "aggressive type of physical therapy for getting back to work."

ties other than trying to avoid heavy lifting, specifically try to stay within the 50–pound limit." Dr. Saunders stated Mark was "overall deconditioned." He spoke with Mark about certain activities and exercises he could do to help with his overall physical conditioning. Dr. Saunders stated that, with an active reconditioning program, Mark might be able to lift 75 to 100 pounds. He noted that Mark complained of pain in his arm and a dropped foot but that, in his opinion, these were not associated with any delay in surgery. Dr. Saunders testified that the neurological losses he would expect to find as a result of a delay in surgery such as Mark's included loss of balance, bladder and erectile dysfunction, weakness in the extremities, and sensory paresthetic complains. According to Dr. Saunders, Mark did not present any of these issues. Dr. Saunders stated that, in his opinion, the delay in surgery did not cause an injury to Mark.

■ Following the close of evidence, the judge provided the proposed jury charge to the parties. Question Number 1 of the jury charge asks, "Did Security Insurance Company of Hartford fail to comply with its duty of good faith and fair dealing to Mark Bennett?" The Bennetts requested the judge instruct the jury that:

> An insurer fails to comply with its duty of good faith and fair dealing by:
> Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability has become reasonably clear;
>
> or
>
> Refusing to pay a claim without conducting a reasonable investigation of the claim;
>
> or
>
> Failing to provide workers' compensation benefits without conducting a reasonable investigation of the claim for benefits.

The trial judge denied the request and instructed the jury:

> An insurer fails to comply with its duty of good faith and fair dealing by:
> Failing to pay benefits when the insurer's liability has become reasonably clear;
>
> or
>
> Refusing to pay benefits without conducting a reasonable investigation.

Although the Bennetts assign this instruction as error, we cannot agree. The Bennetts' suit against SIC was based on their belief that SIC unnecessarily delayed Mark's surgery. The Bennetts' presentation of evidence focused on (i) the amount of time between Mark's March 4 injury and his August 7 surgery, (ii) SIC's purported delay in requesting medical records and a second opinion, (iii) the postponement of the June 28 surgery, and (iv) Mark's purported long-term injuries resulting from the delay. During closing argument, the Bennetts argued the timing of the events, emphasizing that, although SIC found out about Mark's injury on March 5 and his doctor recommended surgery on April 19, SIC delayed or did not timely request medical records and a second opinion, resulting in Mark's having to wait until August for surgery. The instruction given in the charge, failing to pay benefits *when* the insurer's liability has become reasonably clear, focuses on this issue of timing and delay. Thus, if SIC had failed to pay when SIC's liability on Mark's surgery was "reasonably clear," the company would have failed to comply with its duty of good faith and fair dealing. Because the jury charge instruction given fairly encompassed the pleadings and the evidence, we cannot conclude the trial

judge abused his discretion in denying the Bennetts' requested instructions and submitting the instruction that was given. We overrule the Bennetts' first and second issues.

We affirm the trial court's judgment.

